Filed 1/29/15  Rojas v. Cal. State Personnel Board CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| ADRIAN ROJAS, | |
| Plaintiff and Appellant, | G050395 |
| v. | (Super. Ct. No. CIVRS1202052) |
| CALIFORNIA STATE PERSONNEL BOARD, | O P I N I O N |
| Defendant and Respondent; | |
| CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION, | |
| Real Party in Interest and Respondent. | |

Appeal from a judgment of the Superior Court of San Bernardino County, Joseph R. Brisco, Judge.  Affirmed.

Lackie Dammeier & McGill and Michael A. Morguess for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Stephen A. Jennings for Real Party in Interest and Respondent.

# INTRODUCTION

Adrian Rojas appeals from the denial of his petition for administrative mandate filed after the State Personnel Board (the Board) upheld the termination of his position with the Department of Corrections and Rehabilitation (the Department). The trial court found that sufficient evidence presented at an administrative hearing supported his termination for dishonesty and failure of good behavior.

We affirm. Our role is not to retry the case, but to determine whether substantial evidence supports the administrative law judge's decisions. There was ample evidence that Rojas' actions in fabricating reports for other Department employees were both dishonest and likely to result in discredit to the Department. These reports are official documents that may become evidence in legal proceedings. Like Caesar's wife, they must be above suspicion, at least as to their truthfulness. Rojas' actions seriously undermined the Department's ability to present the reports as reflecting actual events, which could, under easily foreseeable circumstances, have proved disastrous. We likewise conclude that the Board did not abuse its discretion when it upheld the Department's penalty of terminating Rojas' employment.

# FACTS

Rojas worked as a supervisor of guards at the California Institution for Men in Chino. On August 1, 2008, he responded to a call from one of his subordinates, Walter Berman, who informed him an inmate had spat in his (Berman's) face. Berman pepper-sprayed the inmate, and he and Rojas took the inmate out of the cell for decontamination. While this was going on, three other guards were stationed in the hall, in case backup was needed, but they took no part in the altercation with the inmate or its aftermath.

Pepper-spraying an inmate is considered use of force,[1] and a guard involved in or witnessing use of force on an inmate must prepare an incident report, on a departmental 837-C form.[2] Both Berman and Rojas prepared reports of the pepper-spray incident.

Berman handwrote his initial report and gave it to Rojas to type up. Berman then gave the typewritten report to his and Rojas' superior, Lieutenant Orani. After reviewing the report, Orani told Berman he wanted the names of the three backup guards included in the report, even though, as Berman explained, they had taken no part in the incident.[3] Orani retyped Berman's report, in Berman's presence, to include the additional names, and Berman reviewed and signed the revised report.

Rojas spoke to Berman after the revised report. Although it is not entirely clear, Berman apparently told Rojas that Orani expected Rojas to include the names of the backup guards in his report at well. Rojas initially refused, maintaining they had not been involved in the incident.

Rojas eventually prepared three virtually identical reports for each of the three backup guards. He signed the names of two of them to their respective reports.[4] None of the guards saw the reports in 2008, when they were submitted.[5]

---

[1]    See California Code of Regulations, title 15, section 3268, subdivision (c)(1).

[2]    In 2008, California Code of Regulations, title 15, section 3268.1, subdivision (a)(1) provided, "An employee who uses or observes non-deadly force greater than verbal persuasion to overcome resistance or gain compliance with an order shall document that fact. The document shall identify any witnesses to the incident and describe the circumstances giving rise to the use of force, and the nature and extent of the force used. The employee shall provide the document to his or her immediate supervisor." The supervisor then had to review the employee's report and make a decision as to the appropriateness of the force used. Both the report and the decision were then forwarded through the chain of command to the head of the institution for approval or follow-up action. (Former Cal. Code Regs., tit. 15, § 3268.1, subd. (a)(2).)

In 2010, this regulation was heavily amended, but the employee's obligation to report incidents of force either used or witnessed remained unchanged, as did the supervisor's obligation to review the report and forward it up the chain of command.

[3]    Berman testified Orani was concerned about how a review board would react to an incident in which only two guards responded, without backup.

[4]    The third report had a typed name, but no signature.

3

Rojas also prepared his own report of the incident, dated August 1. On the same day, Orani sent Rojas a list of 13 questions designed to fill in details missing from his initial report, giving Rojas until August 3 to respond. Among the questions was "Officer Berman's report indicates [the three backup guards] were also involved in the incident and assisted in providing coverage? Explain." and "Need reports from all staff involved in this incident." Rojas responded on August 7. To the first question, Rojas responded "No. His report does not reflect that."[6] To the second, he replied, "No other custody staff was involved in this incident."

The reports traveled up the chain of command until they reached Brian Pahel, who was at the time captain of healthcare operations at the prison. Pahel noticed the striking similarity in language among the reports of the three backup guards, including an error repeated in all three reports. While one employee may sign for another, the long-standing practice is that in those instances the signing employee signs his own name, followed by the number 4 in a circle, then the name of the person signed for. None of the three reports was signed in this way. Pahel also noted the inconsistencies among the reports; he felt obliged to present the matter to the use of force committee and to recommend further investigation.

An internal affairs agent investigated the matter in May 2009. She showed Rojas the reports from the three backup guards and asked him whether he had their permission to write the reports and sign their names. He said he had spoken to all three employees, obtained their permission to prepare their reports, and told them he would sign for them. Rojas also told the investigator that his usual practice when signing for

---

[5] It is not clear from the record when Rojas prepared these reports. All three are dated August 1, 2008, the date of the incident. Rojas signed them as approved on September 11, August 11, and September 1. His own report is dated August 1, but Orani did not sign it as approved until August 7. Orani approved Rojas' answers to the additional questions on August 7.

[6] Berman's report did, in fact, name the three backup guards.

4

another employee was to sign his own name, add the circled number four, then the name of the other employee.

The Department sent a notice of adverse action – dismissal from his position as correctional sergeant – to Rojas in October 2009. It listed five grounds for dismissal: inexcusable neglect of duty, insubordination, dishonesty, willful disobedience, and other failure of good behavior.[7] Rojas appealed from the adverse action and demanded a hearing before an administrative law judge.[8] The hearing occupied three days in April 2011.

The three backup guards testified at the administrative hearing. One guard stated he had not written a report of the pepper-spray incident, and he had not seen the report bearing his name until May 2009, when he was interviewed in connection with the internal affairs investigation. He did not authorize Rojas to prepare the report for him or sign his name to it. The second guard, who was leaving to go to another facility at the time of the incident, told Rojas what his involvement had been and that if Rojas needed a report he would provide one. He then became ill and was out of commission for several months, so he did not see or sign the report Rojas prepared in his name. He too saw the report for the first time during the internal affairs investigation over a year later. The third backup guard likewise had not seen the report prepared in his name until the internal affairs investigation. He pointed out an inaccuracy in the report, which stated that he had monitored the inmate for 45 minutes after the inmate had been returned to his cell. The third guard had not monitored the inmate.

Pahel testified at the administrative hearing about the use of incident reports. They "articulate [that] a particular incident occurred on a particular date and support us in what we're doing as far as the accuracies of the reports, should we end up in

_____

[7] All of these are grounds for discipline under Government Code section 19572.

[8] The Department offered Rojas a demotion in rank as an alternative to dismissal. Rojas originally accepted the offer, but then changed his mind.

5

litigation. Everybody brings their reports. That's what they wrote, and they have to attest to it." He also explained the consequences of inaccurate reports: "If the inmates feel that we're not factual in our reports and we document things that are less than truthful they will draw lines amongst themselves in their own ethnic groups. And if they feel that they're not being treated fairly and objectively at all times, then they can and they have in the past assaulted staff." Pahel also stated that only in the most unusual circumstances would a supervisor prepare a report for an employee, and one employee could never properly sign for another without the other employee's knowledge and consent.

The administrative law judge dismissed two grounds for discipline – insubordination and willful disobedience – for lack of sufficient evidence. The other three grounds – dishonesty, neglect of duty, and failure of good behavior – were upheld.[9] Rojas did not present any witnesses on his own behalf.

Rojas filed a petition for a writ of administrative mandate, which petition was heard in January 2013. The court upheld the administrative decision on dishonesty and failure of good behavior, while finding insufficient evidence to support neglect of duty. In light of Rojas' 16 years of service without any history of prior discipline and production of sufficient evidence to establish only two of the five original charges, the court remanded the matter to the Board for reconsideration of Rojas' termination.

On appeal, Rojas identifies two issues. He asserts, first, that the Board lacked substantial evidence for its determinations and, second, that the Department abused its discretion by terminating his employment.

---

[9] Rojas moved to dismiss the charges under Government Code section 19582, subdivision (a), at the close of the Department's case. The administrative law judge granted his motion as to two of the charges and denied it as to the remaining three. Thereupon Rojas declined to put on a defense case.

## DISCUSSION

I.        **Sufficiency of the Evidence**

On an appeal from the denial of a mandamus petition such as this one, we employ the substantial evidence test. (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 217, fn. 31.) "We examine all relevant evidence in the administrative record and view that evidence in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all inferences in support of the judgment." (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1490.) We do not re-evaluate the evidence, but rather uphold the Board's factual determinations when they are based on substantial evidence. (*Catricala v. State Personnel Bd.* (1974) 43 Cal.App.3d 642, 648.) "Decisions of the State Personnel Board, an agency of constitutional authority [citation], are reviewed only to determine whether substantial evidence supports the determination, even when vested rights are involved." (*Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1125.)

By the time of the hearing on Rojas' mandamus petition, the original charges had been reduced from five to three. The trial court granted Rojas' petition as to one of the remaining charges, leaving the last two: dishonesty and failure of good behavior. Government Code section 19572 provides in pertinent part: "Each of the following constitutes cause for discipline of an employee . . . : [¶] . . . [¶] (f) Dishonesty. [¶] . . . [¶] (t) Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment." The trial court denied the petition as to these two grounds.

Substantial evidence supports upholding the Board's finding of dishonesty. Not only did Rojas concoct three reports for other employees, he lied about them to an internal affairs investigator. While there is apparently a practice at the prison whereby

7

employees sign for each other – with permission – when they do so, they indicate as much by signing their own names with the number 4. Rojas did not follow even this dubious practice, and the evidence supported the inference that he ignored it deliberately – because he thought his supervisor was being too picky. His conduct went beyond simply signing for other employees; he tried to fob off reports he had written as having been written by others. Moreover, when asked by his supervisor, Orani, to fill in additional details of his initial report, he stated that no other staff was involved, even after Orani identified the three backup guards by name and specifically asked for their reports.

At the administrative hearing and in the trial court, Rojas focused on the absence of a rule or regulation prohibiting one person from signing for another. Captain (now Associate Warden) Pahel agreed that there was no written rule or policy, but he stated it was common practice, as well as common sense, that on those occasions when one person signed for another, the signer identified himself.

Peace officers may be held to higher standards of honesty than civilian employees, and dishonesty in law enforcement personnel is treated harshly. (*Cate v. State Personnel Bd.* (2012) 204 Cal.App.4th 270, 285; see *Barber v. State Personnel Bd.* (1976) 18 Cal.3d 395, 404 [government has strong interest in maintaining high standards of public service and conduct at custodial institutions].) Rojas was perfectly aware of the practice by which one employee signs for another. He ignored this practice, instead representing to his superiors that the three backup guards had each prepared and signed their own reports. He further tried to mislead the internal affairs investigator about having cleared his actions with the three guards. Such evidence provides an ample basis for upholding a finding of dishonesty.

8

Similarly, the evidence supports the charge of failure of good behavior.[10] "Discipline pursuant to the quoted statute must be based on more than failure of good behavior; it must be of such a nature as to reflect upon [the employee's] job. That is, it must bear some rational relationship to his employment and must be of such character that it can easily result in the impairment or disruption of the public service." (*Warren v. State Personnel Bd.* (1979) 94 Cal.App.3d 95, 104.) The failure of good behavior need not, however, be known to the public at large. (*Nightingale v. State Personnel Board* (1972) 7 Cal.3d 507, 513-514.)

Unquestionably Rojas' falsification of the reports could easily have caused the Department serious problems. As Pahel testified, the 837-C forms are official documents. They record what the Department represents actually happened, and the Department is stuck with them. They are not busywork. If litigation had resulted from the use of force on this inmate and the circumstances of the reports' preparation had come to light, the Department would have been fortunate if "discredit" was all that befell it. Rojas' stout –and false – defense of what he had done, both to his immediate supervisor and to the internal affairs investigator, attests to his understanding that he had behaved improperly when he prepared the reports and tried to pass them off as the work of the three backup guards.

## II.        Abuse of Discretion

Rojas also asserts that termination of his employment was too harsh a penalty and an abuse of discretion.[11] We do not disturb the penalty imposed by an

---

[10]     Government Code section 19572, subdivision (t), identifies this cause for discipline as "Other failure of good behavior either during or outside of duty hours, which is of such a nature that it causes discredit to the appointing authority or the person's employment."

[11]     The trial court sent the matter back to the Board to reconsider Rojas' dismissal in light of the outcome of the mandamus petition. We do not believe this was an alternative open to the trial court. Its role, and ours, is to decide whether the Board abused its discretion when it imposed the penalty it did.

administrative body unless there has been an abuse of discretion. (*Skelly v. State Personnel Bd.*, *supra*, 15 Cal.3d at p. 217.) In determining whether the agency has abused its discretion, the overriding consideration is the harm or likelihood of harm to the public service. We also consider the circumstances surrounding the misconduct and whether it is likely to recur. (*Warren v. State Personnel Bd., supra,* 94 Cal.App.3d at p. 108.)

The Board did not abuse its discretion. Rojas compromised the integrity of the use-of-force reporting system. Instead of owning up to the impropriety of his actions, he kept trying to cover them up – first with Orani and then with the investigator. (See *Barber v. State Personnel Bd., supra,* 18 Cal.3d at p. 404 [counselor at youth offender school lied about watch, tried to frame former inmate; dismissal not abuse of discretion].) Ultimately Rojas' actions necessitated a full-blown internal investigation.

Rojas clings to the notion he did nothing wrong – or at least very wrong – because there was no specific rule against it. But you don't need a rulebook to know that lying is wrong. The Department was well within the bounds of reason when it decided it did not want Rojas operating in a position of authority in a state prison.

Rojas is, of course, free to approach the Department with the trial court's recommendation and ask to have his job back.[12] We, however, must do our job, which is to decide whether the Board abused its discretion when it upheld the termination Rojas' employment. We conclude it did not.

---

We should also point out that the Department's failure to support three of the five charges does not really redound to Rojas's credit. The Department based all of the charges on the same set of facts; it did not have five separate incidents resulting in five charges. The label placed on the misconduct is immaterial; what matters is that Rojas' behavior warranted discipline.

[12] We also note that the Department offered Rojas demotion as a penalty in lieu of termination, which he turned down. If the parties can get past this lawsuit, they may yet have a future together.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed.  The Board shall recover its costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

11